IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| ROBERT D. WHITE and RENEE K. WHITE, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 150357D |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION** |

This Final Decision incorporates without change the court's Decision, entered April 15, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiffs appeal Defendant's conference decision dated April 14, 2015, for the 2010, 2011, and 2012 tax years. A trial was held in the Oregon Tax Courtroom on December 1, 2015, in Salem, Oregon. Daniel Sterns appeared on behalf of Plaintiffs. Daniel Moore (Moore), Steven Murray (Murray), Renee White (Renee), and Robert Douglas White (Robert) testified on behalf of Plaintiffs.[1] Peggy Ellis (Ellis) appeared and testified on behalf of Defendant. Plaintiffs' Exhibits 1 through 56 were received without objection. Defendant's Exhibits A through J, and L through R, were received without objection. Defendant's Exhibit K was received over Plaintiffs' objection.

/ / /

/ / /

/ / /

---

[1] When referring to a party in a written decision, it is customary for the court to use that person's last name. However, in this case, the court's Decision recites facts and references to two individuals with the same last name, White. To avoid confusion, the court will use the first name of the individual being referenced.

I.  STATEMENT OF FACTS

A.    *Plaintiffs' Evidence*

Renee testified that Plaintiffs started their alpaca farm in 1998 after they retired

and moved to Chiloquin, Oregon.  She explained that Plaintiffs attended shows and

received training on how to raise alpacas for a profit.  In 1999, Plaintiffs created a

business plan for their alpaca farm.  (Ptfs' Ex 9.)  The plan strategy was to breed and

raise alpacas for sale.  (*Id*. at 1.)  The marketing plan included selling animals by direct

sales and on the web.  (*Id*. at 2.)  Renee testified that Plaintiffs have not revised their

original business plan, but she felt that an article about the financial aspects of alpaca

ownership, containing economic forecasts, represented their business plan going forward.

(Ptfs' Ex 10 at 5–6.)

In 1999, Plaintiffs purchased two female alpacas, Danea and Sienna, for $12,000

each.  (Ptfs' Ex 26 at 1.)  In 2004, Plaintiffs decided that Danea would be unable to breed,

but they kept her as part of the herd.  (*Id*.)  In 2009, Plaintiffs determined that Sienna

could not be bred due to a health condition, and in 2011 Plaintiffs sold Sienna for $120.

(*Id.*; Def's Ex K at 3.)  In 2000, Plaintiffs purchased Arcata for $12,500, Miss Annie for

$10,000, and TAA Terrence, as a foundational stud, for $6,300.  (Ptfs' Ex 26 at 1.)

Renee testified that in 2001 she determined TAA Terrence's fiber was too course to be a

breading male, but Plaintiffs maintained the alpaca, and deducted expenses for his care,

until his death in 2009.  In 2000, the farm saw the births of Fawn and Stormy.  (*Id*.)

Fawn was noted as being born with course fiber (a negative trait) but was bred in 2008

and 2009 resulting in crias with course fiber.[2]  (*Id.* at 1–2.)  As a result, Fawn was not

---

[2] A cria is a baby alpaca.

bred again but remained in the herd until at least 2015.  (Def's Ex K at 1–3; Ptfs' Ex 27 at 19.)  Plaintiffs determined that Stormy had too course fiber by 2004 and gave him away in 2009.  (Ptfs' Ex 26 at 1.)

Renee testified that when Plaintiffs starting breeding their alpacas they had a large number of males in a row, which was an impediment to growth of their herd.  Renee testified that they did not try to sell the males until 2003.  Renee testified that in 2003, Plaintiffs were offered $30,000 for a cria named Moira, but they declined the offer to make Moira a breeding foundation female.

Renee testified that in 2005, Plaintiffs moved to Sutherlin, Oregon.  Renee testified that Plaintiffs sent mailers to all their neighbors with over five acres of land and started an alpaca boutique to increase income.  Renee testified that she sent notices to church groups, retirement homes and families to spread the word about alpacas.  Renee testified that Plaintiffs had half a dozen "ranch visit" days to increase and support sales.

Renee testified that Plaintiffs had fiber samples tested each year and kept samples for each of the animals labeled by year in boxes for review by potential buyers.  (*See* Ptfs' Ex 17.)  Renee testified that Plaintiffs spent more hours to process and clean fiber from the alpacas than was prudent in a business sense, but she felt it was an important endeavor to help the fiber industry as a whole to grow.  Renee testified that they spend two and one-half to three hours per day caring for alpacas.

Renee testified that Plaintiffs were aware of auctions where alpacas were sold from $5,000 to $87,000, but Plaintiffs did not attempt to sell their alpacas through auctions.  (*See* Ptfs' Ex 13.)  Renee testified that most of Plaintiffs alpacas that left the farm were sold at a *de minimis* "pet value" or given away for free.  Renee testified that

the highest sale for any of their alpacas was $500 in 2004. Renee testified that she believed that the aforementioned sale generated a profit because the alpaca was born on the farm, although she was not sure of the actual costs incurred to raise any of the alpacas.

Renee testified that in 2012 a cria was born during a period of extreme heat and faced the risk of dying. To save the cria, Plaintiffs took the animal into their home which was air-conditioned. Plaintiffs also took the cria's dam into the house to facilitate nursing. After several days, the cria was well enough to return to the outdoors.

Robert testified that while raising alpacas is pleasurable, the large number of animals on their farm represented hard work rather than a hobby. He testified that it was necessary to process alpaca fiber to make the nascent U.S. industry viable. Robert testified that in 2010, Plaintiffs expended $1,017 for shearing costs while their gross sales of fiber were $263.

Moore testified that he is an enrolled agent and has been preparing taxes for approximately 30 years. Moore testified that he prepared Plaintiffs' tax returns for the years at issue and he separated income and expenses from the farm and boutique because he understood the IRS to prefer that method, although he believes the two businesses are part of the same operation. Moore testified that in 2010, Plaintiffs sold a trailer which resulted in a $9,000 gain reported as "other gains" on their tax return. (*See* Ptfs' Ex 5 at 9.) Moore testified that in 2011, Plaintiffs had $8,793 in gross sales from the boutique which resulted in a net profit of $849 for that year. (*See* Ptfs' Ex 6 at 3.) Moore testified that in 2012, Plaintiffs had $4,861 in gross sales from the boutique which resulted in a net

/ / /

profit of $1,729. (*See* Ptfs' Ex 7 at 3.) Moore testified that in his opinion Plaintiffs did not plan to use the farm as a "tax shelter."

Murray testified that he has owned and operated an alpaca farm since 1997 and also maintained an alpaca sheering service. Murray testified that he has done sheering work for Plaintiffs and many other alpaca farms and charges $25 per animal. He also testified that sheering is necessary for the well-being of alpacas and is not an optional activity. He testified that based on his observations of various farms he believed Plaintiffs ran their farm in professional manner and the animals were well cared for. Murray testified that he did not believe Plaintiffs' farm was a hobby because of the large number of animals which require a significant amount of hard work. Murray testified that he believed the alpaca business has remained viable and has seen ranches make a profit by selling animals whose prices can reach up to $50,000 to $100,000. The key to the alpaca business, according to Murray, is maintaining a good breeding stock, obtaining awards, and keeping fiber quality high. Murray testified he did not have any specific information about the profitability of Plaintiffs' farm.

B.     *Defendant's Evidence*

Ellis testified she is a tax auditor for Defendant and participated in the audit of Plaintiffs' alpaca operation. Ellis noted that Plaintiffs have incurred large Schedule F farm losses each and every year from 1998 through 2014 as follows[3]:

| Year | Income | Expense | Loss |
|------|--------|---------|------|
| 1998 | n/a | n/a | ($40,534) |
| 1999 | $1,530 | $44,409 | ($42,879) |
| 2000 | $5,176 | $46,711 | ($41,535) |
| 2001 | $4,458 | $70,146 | ($65,688) |
| 2002 | $4,900 | $71,822 | ($66,922) |

---

[3] This table is from Def's Ex I at 1.

| 2003 | $3,000 | $64,496 | ($61,496) |
| 2004 | $5,000 | $63,026 | ($58,026) |
| 2005 | $7,750 | $57,025 | ($49,275) |
| 2006 | $0 | $61,027 | ($61,027) |
| 2007 | $0 | $72,923 | ($72,923) |
| 2008 | $0 | $69,459 | ($69,459) |
| 2009 | $8,150 | $77,621 | ($69,471) |
| 2010 | $0 | $67,348 | ($67,348) |
| 2011 | $812 | $56,100 | ($55,288) |
| 2012 | $165 | $55,913 | ($55,748) |
| 2013 | $911 | $38,570 | ($37,659) |
| 2014 | $2,271 | $22,105 | ($19,834) |
| Total | | | ($935,112) |

Ellis testified that the income and expense history does not show a typical business pattern of decreasing expenses and increasing income; instead, the amounts appeared to be random. Ellis testified that very little income was derived from the sale of alpacas and the largest gains were from an insurance policy from the death of an animal and the sale of a trailer.

Ellis testified that Plaintiffs had significant retirement income to fund operations of the farm. Plaintiffs' adjusted gross income (excluding schedule F losses) from 2003 through 2014 totaled $1,204,946, during which time they had schedule F losses of $677,554. (Def's Ex R at 1.) Ellis testified that as a result of the schedule F losses, Plaintiffs greatly reduced their taxable income.

Ellis testified that Plaintiffs lived on their farm property, which she believes provides them the same type of emotional satisfaction as is common with horse property owners. She testified that the type of activity conducted at the farm and in alpaca associations gave them a connection to the community, which is often associated with personal pleasure.

/ / /

Ellis testified that Plaintiffs kept animals for years after determining they were no longer economically viable, and instead of selling or disposing of them, they maintained those animals in the herd and deducted expenses related to their care. Ellis testified that Plaintiffs did not keep sufficient records to ascertain the actual cost of the animals so they could make a determination of profitability. Ellis testified that Plaintiffs' declining farm expenses in the 2014 tax year were based on a decision by Plaintiffs not to claim actual expenses, so as to make it appear the business was approaching profitability.

## II. ANALYSIS

The issue in this case is whether Plaintiffs' alpaca farm was a business, for which deductions are allowed under Internal Revenue Code (IRC) section 162, or an activity not engaged in for profit, under IRC section 183.

### A. Burden of Proof

"The Oregon Legislature intended to make Oregon personal income tax law identical to the [IRC] for purposes of determining Oregon taxable income, subject to adjustments and modifications specified in Oregon law." *Ellison v. Dept. of Rev.*, TC-MD 041142D, WL 2414746 at *6 (Sept 23, 2005) (citing ORS 316.007). The legislature adopted, by reference, the federal definition for deductions allowed under IRC section 162 for trade or business expenses and IRC section 212 for nonbusiness expenses incurred in the production of income. Allowable deductions from taxable income are a "matter of legislative grace" and the burden of proof (substantiation) is placed on the individual claiming the deduction. *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992).

/ / /

Plaintiffs argue that Defendant has the burden of proof for the 2011 and 2012 tax years because it made "naked assessments" without conducting a full audit for those years. *See Weinarskirch v Comm'r,* 596 F2d 358 (9th Cir 1979). Plaintiffs are in error for several reasons. First, while Oregon has adopted the IRC with respect to determining taxable income and adjustments, it has specifically adopted its own burden of proof. The burden of proof in the Oregon Tax Court is a preponderance of the evidence and falls upon the party seeking affirmative relief. ORS 305.427.[4] Second, Defendant presented substantial information demonstrating a basis for its 2011 and 2012 assessments. In *Weinerskirch*, the IRS provided no evidence to support allegations that a taxpayer's income was derived from sales of narcotics and instead relied entirely on the presumption of correctness of its assessment. In this case, Defendant provided evidence of Schedule F losses for 15 straight years and assessed Plaintiffs for the 2011 and 2012 tax years only after it completed its 2010 audit and determined Plaintiffs lacked the intent to make a profit. Defendant had a reasonable basis for assessing the deficiencies. Pursuant to Oregon law, Plaintiffs have the burden of proof to support their deductions.

*B. Deductibility of Farm Expenses*

Under IRC section 162(a), a deduction is allowed for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business[.]" The code and regulations preclude deductions "for expenses incurred in connection with activities which are not engaged in for profit[,]" except as provided in IRC section 183. Treas Reg § 1.183-2(a). "[D]eductions are not allowable under section 162 or 212 for activities which are carried on primarily as a sport, hobby, or for

---

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

recreation." *Id.* If the activity is not engaged in for profit, expenses may be deducted under IRC section 183 only to the extent of any profits. *Gallo v. Dept. of Rev.*, TC-MD 011022F, WL 21675927 at *3 (July 8, 2003).

> "The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. In determining whether such an objective exists, it may be sufficient that there is a small chance of making a large profit. * * * In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent."

Treas Reg § 1.183-2(a); *Comm'r v. Groetzinger*, 480 US 23, 35, 107 S Ct 980, 94 L Ed 2d 25 (1987).

"In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination." Treas Reg § 1.183-2(b). The nonexhaustive list of factors are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort the taxpayer expends; (4) the expectation that the assets may appreciate in value; (5) the taxpayer's success in carrying on similar or dissimilar activities; (6) the history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. *Id.*

1.      *Manner in which taxpayer carries on activity*

"The fact that the taxpayer carries on the activity in a businesslike manner * * * may indicate that the activity is engaged in for profit." Treas Reg § 1.183-2(b)(1). Under

that factor, the court considers "(1) whether the taxpayer maintained complete and accurate books and records for the activity; (2) whether the taxpayer conducted the activity in a manner substantially similar to those of comparable activities that were profitable; and (3) whether the taxpayer changed operating procedures, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability." *Giles v. Comm'r*, 89 TCM (CCH) 770 (2005), 2005 WL 375462 at *9 (US Tax Ct) (citing *Engdahl v. Comm'r*, 72 TC 659, 666-67 (1979); Treas Reg § 1.183-2(b)(1)).

"A written business plan is not required if the 'business plan was evidenced by * * * actions.' " *Betts v. Comm'r*, 100 TCM (CCH) 67 (2010), 2010 WL 2990300 at *6 (US Tax Ct) (quoting *Phillips v. Comm'r*, 73 TCM (CCH) 2296 (1997), 1997 WL 105015 at *6 (US Tax Ct). Even so, in order to indicate a profit motive, the business plan should demonstrate "meaningful financial analysis." *Id.*

Plaintiffs created a single business plan in 1999 to raise and breed alpacas for sale. The plan identified startup costs but did not include projections of anticipated sales. The plan identified that sales would be accomplished by direct sales, web page marketing, showing animals at regional and national alpaca shows, making videos for care and breeding, using business stationary, creating pamphlets, having open farm days, hosting professional seminars, writing articles, joining professional groups and associations, and maintaining education. (Ptf's Ex 9 at 3–4; Def's Ex J at 3–4.) Plaintiffs did not amend their business plan at any point after its initial creation. The remainder of Plaintiffs' books and records consisted of documents which are more in the category of animal husbandry. The records include breeding records, records of the quality of the

alpacas' fiber, and health records. Conspicuously absent were any financial records with which Plaintiffs could ascertain the expenses of each animal and the amounts needed to sell the animals to create profitability. Plaintiffs did put some animals up for sale, and even though none of their animals actually sold for anything other than a "pet value," it was impossible to tell if they would have even made a profit at the prices advertised to the public.

The evidence shows that Plaintiffs ran a very clean operation and took good care of their animals. They kept track of the animals' care and analyzed fiber samples. But they did not put their animals up for auction like other business. After years of consistent losses, Plaintiffs continued to use the same marketing techniques without changing them to reflect their ineffectiveness. Plaintiffs did not abandon their unprofitable methods. The changes Plaintiffs did make had no impact on the farm's profitability as income continued to decline. Plaintiffs' "failure to improve profitability and unwillingness to abandon the venture under the circumstances only lead[s the court] to conclude as a factual matter that they were personally attached to the venture and their 'predominant, primary or principal objective' was not to profit." *Rodriguez v. Comm'r*, 106 TCM (CCH) 333 (2013), 2013 WL 5272771 at *14 (US Tax Ct). Overall, the manner in which the business was conducted weighs against Plaintiffs.

2.      *Expertise of taxpayers or their advisors*

"The main inquiry is whether [Plaintiffs] received advice from the experts as to the accepted principles and economics of profitably running a business * * *." *Betts*, 2010 WL 2990300 at *8 (citations omitted).

/ / /

Plaintiffs spent a considerable amount of time attending professional meetings and educational seminars. They held open barn days where they educated visitors as potential customers. Plaintiffs presented testimony from an experienced alpaca farmer and shearer that their operation was very clean and professional and had all of the elements of a successful business. This factor favors Plaintiffs.

3. *Time and effort expended*

Plaintiffs spend two and one-half to three hours per day caring for their animals and attending to the business. Plaintiffs attended many seminars, held their own events and did not take many vacations as a result of their operations. The amount of time spent was not insignificant, but it did include personal or recreational aspects, as discussed further in subsection 9, below. This factor is neutral.

4. *Expectation that assets may increase in value*

There are two assets that Plaintiffs may have expected an increase in value: their real property and the alpacas themselves. Plaintiffs included exhibits about the increase in value for their Chiloquin property and alluded to a potential increase in their Sutherlin property. However, under the regulations, holding land with the intent to profit from an increase in its value may be a separate activity than the farm activity.

> "Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value."

Treas Reg § 1.183-1(d)(1).

"Farming and holding land will be considered a single activity only 'if the income derived from farming exceeds the deductions attributable to the farming activity which

are not directly attributable to the holding of the land.' '' *Betts*, 2010 WL 2990300 at *11 (citing Treas Reg § 1.183-1(d)(1)). Plaintiffs did not demonstrate that their alpaca farm reduced the costs of holding the land for appreciation. In fact, Plaintiffs' deductions taken for the farm far exceeded its income from holding of the land.

The expectation as to whether the alpacas would increase in value is a more complex question. Renee testified that Plaintiffs purchased alpacas and operated the farm with the intent that they would appreciate in value and have offspring which would perpetuate the herd. She testified and presented evidence that a "bubble" in the alpaca market thwarted their efforts. While Renee's testimony was believable, her subjective statements must be reviewed in light of all of the facts and circumstances. Plaintiffs' optimism in the profitability of the alpaca business is understandable when they started the operations in the late 1990s. The undated article about the "Financial Aspects of Alpaca Ownership" shows support for Plaintiffs' initial expectations of appreciation. (Ptf's Ex 10.) Plaintiffs presented another article entitled "Do Alpacas Represent the Latest Speculative Bubble in Agriculture?" to explain their lack of profitability over time. (Ptfs' Ex 21.) While the article is undated, it appears to be been written sometime in the early 2000's. But even if Plaintiffs were unaware of the article or the bubble, over time their expectation of appreciation should have become tempered by the reality of year after year losses. Plaintiffs received only a single offer for one of their animals which was above a *de minimis* "pet" value from 1998 through 2013. Plaintiffs also maintained, and year after year deducted expenses for, animals that they knew could not breed and could not expect to appreciate in value because of their physical condition or fiber

/ / /

quality. (*See* Ptfs' Ex 26). By 2010, Plaintiffs could no longer reasonably expect their alpacas to appreciate. This factor weighs against Plaintiffs.

5.      *Success in carrying on similar or dissimilar activities*

"[A] taxpayer's previous success in similar activities may show that the taxpayer has a profit objective even though the current activity is presently unprofitable. A taxpayer's success in other, unrelated activities also may indicate a profit objective." *Storey v. Comm'r*, 103 TCM (CCH) 1631 (2021), 2012 WL 1409273 at *11 (US Tax Ct) (citations omitted). No evidence was presented that Plaintiffs have been successful in similar farm activities or that they have "converted them from unprofitable to profitable enterprises." Treas Reg § 1.183-2(b)(5). Plaintiffs are both retired and did not engage in similar farm activities in their previous careers. This factor weighs against Plaintiffs.

6.      *History of income or losses*

> "[W]here losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, * * * may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, * * * such losses would not be an indication that the activity is not engaged in for profit."

Treas Reg § 1.183-2(b)(6).

At trial the parties vigorously debated whether Plaintiffs had to plan to recoup all losses or just regain some profitability. Plaintiffs argue that the doctrine of recoupment was refuted in *Helmick v. Comm'r*, 98 TCM (CCH) 269 (2009), 2009 WL 3012725 at *10 (US Tax Ct). Plaintiffs also argue that in 2014, Plaintiffs showed a turn-around towards profitability.

/ / /

In *Helmick* the court stated that taxpayers do not need a plan to recoup all of their losses over the entire life of a business if they "meet their burden as to any year for which they show that they expected eventually to recoup losses sustained in the " 'intervening years' * * * between the current year and the hoped-for profitable future." *Id.*

Plaintiffs' losses continued during the years in issue even if the court filters out their history of prior losses. Plaintiffs did not demonstrate how or when they expected to recoup those losses. Moreover, Plaintiffs did not explain how other farms were able to sell their alpacas for significant value during the "bubble" period, whereas Plaintiffs did not sell a single animal for market value during their more than 15 years of operation.

Plaintiffs' contention of a "turn around" in 2014 is also not supported. Plaintiffs did not show a trend toward profitability by selling more animals, but rather reallocated, eliminated, or lessened potential expenses so as to seem less unprofitable.

Plaintiffs contend that the farm and the retail alpaca boutique should be viewed together as one business. In looking at the degree to which the activities were tied together, being in the same location, using the same resources (alpaca fiber) and their joint and supportive marketing, it appears reasonable to treat the two businesses together. See *Keanini v. Comm'r*, 94 TC 41 at 45–46 (1990). But even if we add the very minor profits of the boutique business in to the equation, Plaintiffs' losses in excess of $900,000 over a 16 year period paint a very clear picture. "While a person may start out with a bona fide expectation of profit, even if it is unreasonable, there is a time when, in light of the recurring losses, the bona fides of that expectation must cease." *Prieto v. Commm'r*, 82 TCM (CCH) 716 (2001), 2001 WL 1196201 at * 8 (US Tax Ct). This factor weighs against Plaintiffs.

7.    *Amount of occasional profits earned*

"An occasional small profit from an activity generating large losses, or
from an activity in which the taxpayer has made a large investment, would
not generally be determinative that the activity is engaged in for profit.
However, substantial profit, though only occasional, would generally be
indicative that an activity is engaged in for profit, where the investment or
losses are comparatively small."

Treas Reg § 1.183-2(b)(6).

Even if the boutique and farm are considered together, Plaintiffs have never

generated an overall profit from the farm.  Plaintiffs presented no evidence of the

possibility of even an occasional substantial profit.  That factor weighs against Plaintiffs.

8.    *Financial status of the taxpayers*

"Substantial income from sources other than the activity (particularly if the losses

from the activity generate substantial tax benefits) may indicate that the activity is not

engaged in for profit especially if there are personal or recreational elements involved."

Treas Reg § 1.183-2(b)(8).  Plaintiffs received significant income from sources other than

the farm, and Plaintiffs paid less tax as a result of their farm losses.  Plaintiffs' primary

source of income was from retirement benefits.  But for that income, they would have

been unable to sustain their farm activity.  For the period 2003 through 2014, Plaintiffs'

adjusted gross income was reduced by over $600,000.  Plaintiffs benefitted substantially

from their Schedule F losses.  (Def's Ex R.)  This factor weighs against Plaintiffs.

9.    *Elements of personal pleasure or recreation*

"The presence of personal motives in carrying on of an activity may indicate that

the activity is not engaged in for profit, especially where there are recreational or

personal elements involved." Treas Reg § 1.183-2(b)(9).  Plaintiffs testified that the farm

activity was hard work while also admitting it had an element of personal pleasure.  The

testimony of Renee in relaying a heartfelt story of a new-born cria who needed to be brought inside their house to save its life demonstrated the personal connection Plaintiffs had with their animals. Additionally, the social connection of joining associations dedicated to the animals, meetings, and farm visit days seemed to be happy social occasions and not just business. Plaintiffs gave evidence of auction activity that other farms participated in which appeared to generate substantial proceeds. Yet, Plaintiffs did not attempt to sell their animals in the auction and instead relied on a more social style for sales. Plaintiffs lived and worked on the farm which offered them a rural lifestyle that many in their area seek. Overall, this factor weighs against Plaintiffs.

## III. CONCLUSION

After careful consideration, the court concludes that Plaintiffs did not operate their farm with the requisite profit objective during any of the tax years at issue. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs farm deductions for the 2010 through 2012 tax years should be disallowed to the extent their losses exceeded their net farm income.

Dated this ____ day of May 2016.

_____
RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by __mailing__ to: 1163 State Street, Salem, OR 97301-2563; or by __hand delivery__ to: Fourth Floor, 1241 State Street, Salem, OR.*
*Your complaint must be submitted within __60__ days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B. This document was filed and entered on May 3, 2016.*